668 So.2d 954 (1996)
Kenneth Maurice TERRY, Appellant,
v.
STATE of Florida, Appellee.
No. 83002.
Supreme Court of Florida.
January 4, 1996.
Rehearing Denied February 29, 1996.
*957 Barbara C. Davis of Whited & Davis, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the convictions and judgment of the trial court imposing a sentence of death upon Appellant Kenneth Maurice Terry. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm appellant's convictions but vacate the sentence of death and reduce appellant's sentence to life imprisonment without eligibility of parole for twenty-five years.

FACTS
On July 14, 1992, shortly before 2 a.m., the Daytona Beach Police Department responded to a murder/robbery complaint at a Mobil Station in Daytona Beach. At the scene, the police found Joelle Franco dead in the store area of the station. On the floor of the store, the police found a white knit cap with "Down with O.P.P." printed on it along with a green and plastic bag with the words "Foot Action" printed on it. A red ski mask was found two blocks from the scene.
At trial, Mr. Franco testified that on the night of the murder he was in the station's garage and his wife was in the station's convenience store. Mr. Franco looked up when he heard a voice say, "Don't move or I shoot." A man in a red mask was pointing a small silver gun at him. Mr. Franco heard a scream and thirty seconds later a shot. A second man, who was not wearing a mask, emerged from the office.
Subsequently, Audrin Butler, the brother-in-law of codefendant Demon Floyd and appellant's girlfriend, informed the police about appellant and Floyd's involvement in a series of unconnected armed robberies. On the basis of this information, the police arrested appellant and Floyd and obtained a warrant to search the appellant's apartment. During the search, the police seized a mask similar to the ones found at or near the murder scene, an inoperable .25 caliber handgun, and an operable .38 caliber handgun. Ballistic testing proved that the fatal shot came from the .38 caliber handgun. After appellant was arrested his shoes were seized. DNA testing matched blood stains on appellant's shoes with the victim's blood.
After being arrested, Floyd confessed to his involvement in the murder. He told the police that he and appellant were riding around looking for places to rob and that appellant had the guns and masks in the green and white "Foot Action" bag. Floyd wore the red mask and had the inoperable.25 caliber gun, and Terry wore the white "O.P.P." mask and used the .38 caliber gun. Floyd held Mr. Franco in the garage while Terry went to rob Mrs. Franco.
Appellant was charged with first-degree murder, armed robbery, and principal to aggravated assault. He was convicted of all the charges. During the penalty phase, the state relied on the evidence previously presented and called no witnesses. Terry, on the other hand, called two witnesses, an aunt and his girlfriend, Valerie Floyd. Terry claimed four nonstatutory mitigating circumstances: (1) emotional and developmental deprivation in adolescence; (2) poverty; (3) good family man; and (4) circumstances of the crimes do not set this murder apart from *958 the norm of other murders.[1] Terry also requested a jury instruction on the age statutory mitigating circumstance under section 921.141(6)(g), Florida Statutes (1993). After the penalty phase, the jury recommended the death sentence by a vote of eight to four. The trial judge found no mitigators and two aggravators: prior violent felony and the merged aggravators of capital felony committed while defendant was engaged in the commission of a robbery and pecuniary gain. See § 921.141(5)(b), (d), (f). On December 23, 1993, the trial court sentenced appellant to death and filed written findings. On appeal, Terry raises eighteen claims.[2]

PRE-TRIAL

Motion to Suppress
Appellant argues that the trial court erred in refusing to suppress certain physical evidence[3] because the affidavit upon which the search warrant was based contained misleading information, which when excised did not leave an affidavit that supplied probable cause to search. We disagree.
A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling. McNamara v. State, 357 So.2d 410, 412 (Fla.1978). If the affidavit causing a warrant to issue contains intentionally and knowingly or recklessly false statements, the court must excise the falsity from the affidavit and review the remainder of the affidavit to determine whether there remained sufficient grounds to establish probable cause. Franks v. Delaware, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667, 672 (1978). If the remaining statements in the affidavit are sufficient to establish probable cause, the erroneous statement does not invalidate the search warrant. Blair v. State, 406 So.2d 1103, 1106 (Fla.1981). If the false statement is necessary for probable cause, the search warrant must be voided and the fruits of the search excluded. Franks, 438 U.S. at 156, 98 S.Ct. at 2676.
*959 In this case, appellant's motion to suppress alleged that the affidavit was deficient in at least five respects. After considering all of the testimony presented at the suppression hearing, the trial judge found one "at least recklessly false" statement in the affidavit. The judge stated:
Detective Ladwig in the first paragraph on page 2 of the affidavit for search warrant states, "This citizen has provided crucial information about crimes in the past which has been useful in the solving of crimes and has provided truthful statements in open court concerning past information provided". The affidavit clearly implies that affiant Ladwig had personal knowledge that Butler had provided crucial information and testified in court about other crimes. Such is not the case. Testimony revealed that information was provided in only one case and that there was no in court testimony. Affiant Ladwig obtained his knowledge of Butler from Butler himself, an assistant state attorney, and another detective. The affiant's statement is at least recklessly false. The false information must be excised from the affidavit in considering whether probable cause existed to issue the warrant.
(Record references omitted.) After setting aside the erroneous statement, the trial court found sufficient facts in the affidavit to demonstrate probable cause. Given the facts remaining in the affidavit after the excision, the fact that the informant personally appeared and was sworn before the warrant-issuing judge, and the great deference we accord the trial court's probable cause determination, we agree with the trial judge's ruling that the affidavit still contained sufficient information to constitute probable cause. Thus, we find no error in the trial court's denial of appellant's motion to suppress.

Blood Sample
Appellant claims that the state did not have probable cause to take a blood sample from him. However, this claim has not been preserved for appeal. To preserve an issue about evidence for appellate review, an appropriate objection must be made at trial when the evidence is offered. Robertson v. State, 94 Fla. 770, 775, 114 So. 534, 536 (1927). "The preliminary interposition of [a motion to suppress] prior to the trial, and an exception to an adverse ruling thereon, is not tantamount to a proper and seasonable objection to the questioned evidence at the trial upon the issue." Id.
In this case, appellant's blood sample, which was located in a vial, was admitted into evidence without objection by the defense. Therefore, this issue has not been preserved for review.[4]

Access to FDLE Analysts' Notes
Appellant claims that the trial court improperly denied him access to the law enforcement analysts' notes. As a preliminary matter, we find, contrary to the state's argument, this issue to be preserved for review.
In Geralds v. State, 601 So.2d 1157 (Fla. 1992), this Court, relying on the Florida Rules of Criminal Procedure,[5] held that field *960 notes by a crime laboratory analyst and crime scene coordinator are exempt from disclosure as notes from which a police or investigative report was compiled and are not subject to disclosure as statements of an expert in connection with a case. Id. at 1159-61. Although the notes in this case were written in a lab and not in the field, we find Geralds sufficiently analogous to find that the trial court did not err.

Position of the Victim
Appellant contends that Dr. Terrence Steiner's testimony regarding Mrs. Franco's position before death should have been disallowed because he was not qualified to give an opinion on this issue.[6] We disagree.
The determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge whose decision will not be reversed absent a clear showing of error. Ramirez v. State, 542 So.2d 352, 355 (Fla.1989). An expert is permitted to express an opinion on matters in which the witness has expertise when the opinion is in response to facts disclosed to the expert at or before the trial. § 90.704, Fla.Stat. (1993). Section 90.702 requires that before an expert may testify in the form of an opinion, two preliminary factual determinations must be made by the court under section 90.105. First, the court must determine whether the subject matter is proper for expert testimony, i.e., that it will assist the trier of fact in understanding the evidence or in determining a fact in issue. Second, the court must determine whether the witness is adequately qualified to express an opinion on the matter. Charles W. Ehrhardt, Florida Evidence § 702.1 (1994 ed.).
At trial, before deciding this issue, the trial court allowed Dr. Steiner's testimony to be proffered. After the proffer, it admitted the testimony and reasoned:
First, I'm going to, first of allthe doctor's qualified as a forensic pathologist. The next question is should he be able to render an opinion which is at issue at this point.
Gentlemen, the issue here deals with whether or not the position of the body is something for which a medical examiner normally reaches conclusions. And frankly, it is, when capable of doing so, and it's clear that Dr. Steiner is using a number of items, factors: The photos, the bleeding, the position of the body, the blood spatter, lack of bruises, trajectory, the damage to the ear, the damage to the nose, among a number of factors, and the, the issue really is whether or not his testimony and his conclusions are proper, and frankly, that is a weight issue, not an admissibility issue.
He initially says during questioning by Mr. Morgan [the defense attorney] that he had training in blood spatter. In his deposition he says, no, he doesn't have training in blood spatter; he's not a blood spatter expert. What that means is he doesn't have, as I understand it, he doesn't have formalized training, but he has training on the scene in seeing these things whenever he goes to a crime scene and it's a factor he applies.
Clearly, he's not a blood spatter expert, but he does have expertise with regard to forensic pathology and one of the issues, as he testified to in forensic pathology, is cause of death and circumstances surrounding the death, and based upon that, I will allow his opinion. It will be up to the jury to determine whether it's a proper opinion, and certainly cross-examination will be a factor in that issue.
We believe that the trial judge's ruling does not represent a "clear showing of error." Although there may be a difference of opinion *961 regarding the weight to be given to Dr. Steiner's testimony concerning the position of the victim before death, its admissibility was within the trial judge's discretion. See Dragon v. Grant, 429 So.2d 1329, 1330 (Fla. 5th DCA 1983); see also Johnston v. State, 497 So.2d 863, 870 (Fla.1986) (holding that where officer possessed working knowledge of Luminol testing, his testimony concerning the Luminol test he performed on defendant's clothes was not inadmissible on ground that he was never qualified as an expert in blood detection). Therefore, we find that the trial court did not err in denying appellant's motion in limine.

Motion for Suggestion of Conflict
As his fifth claim, appellant contends that he has standing to raise a conflict of interest on behalf of his codefendant Floyd.[7] Appellant relies on three authorities to bolster his position.[8] In this case, however, the putative conflict of interest is between Demon Floyd and the Public Defender's Office. No authority supports appellant's position that a third party has standing to raise a conflict of interest argument with regard to a codefendant. The authorities cited by appellant are either distinguishable or inapplicable. Therefore, we find that the trial court did not err in denying appellant's motion for suggestion of conflict.

Motion in Limine: Demon Floyd's Testimony
Appellant's motion in limine moved to prohibit the state from calling Demon Floyd as a witness since "[a]ny testimony given by this witness would be unreliable not only because he has given a number of inconsistent accounts, but because there is strong evidence that he may be mentally impaired." At the outset, we are compelled to note that in order for an argument to be cognizable on appeal, it must be the specific contention asserted as the legal ground for objection, exception, or motion below. Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982).
At trial, when the state called Floyd as a witness, appellant moved to exclude his testimony based on his motion for suggestion of conflict. On appeal, appellant alleges that the trial court erred because it is improper to call a witness for the primary purpose of placing impeachment testimony before the jury. Because Terry's argument on appeal is different from those arguments asserted pre-trial and at trial, he has waived this claim. *962 Even if this claim had been preserved, appellant still would not prevail.[9]

GUILT PHASE
As his seventh issue, appellant claims that when Detective Ladwig testified that appellant was a suspect in other armed robberies, the trial court should have granted his motion for mistrial. However, motions for mistrial are addressed to the trial court's discretion and should be granted only when necessary to ensure that a defendant receives a fair trial. Gorby v. State, 630 So.2d 544, 547 (Fla.1993), cert. denied, ___ U.S. ___, 115 S.Ct. 99, ___ L.Ed.2d ___ (1994). Most importantly, a party may not invite error and then be heard to complain of that error on appeal. Pope v. State, 441 So.2d 1073, 1076 (Fla.1983).[10]
In Czubak v. State, 570 So.2d 925 (Fla. 1990), this Court was faced with a factual scenario similar to the case at hand. Appellant claimed that the trial court erred by refusing to grant a mistrial after key state witness Dorothy Schultz stated during cross-examination that the appellant was an escaped convict. Id. at 927. We analyzed the issue as follows:
Schultz's reference to the fact that Czubak was an escaped convict was clearly inadmissible. Evidence of collateral crimes, wrongs, or acts committed by the defendant is admissible if it is relevant to a material fact in issue; such evidence is not admissible where its sole relevance is to prove the character or propensity of the accused. The fact that Czubak was an escaped convict had no relevance to any material fact in issue.
The state argues that Schultz's comment was invited error. Under the invited-error doctrine, a party may not make or invite error at trial and then take advantage of the error on appeal. We find that Schultz's comment was not "invited" because it was unresponsive to defense counsel's question. Schultz was the state's key witness. On cross-examination defense counsel was attempting, with some difficulty, to elicit from Schultz whether she suspected that Czubak killed Peterson before Detective Pierce suggested it to her. Counsel could not have anticipated that Schultz would respond by stating that Czubak was an escaped convict. The response was volunteered and totally irrelevant to the question posed.
Id. at 928. In short, our analysis focused on whether the witness's answer was responsive to the question and whether counsel could have anticipated the witness's response.
Here, the issue arose during the direct examination of the lead detective, Detective Ladwig. Defense counsel was probing how numerous suspects were ruled out by the police when the following exchange took place:
Q [defense counsel] Do you know Audron Butler?
A [Detective Ladwig] Yes, I do.
Q And how do you know Audron Butler?
A Audron Butler provided information in several armed robberies that had been going on at the time, that developed Mr. Terry and Mr. Floyd as suspects in this case also.
After hearing arguments from both sides, the trial court ruled on the issue:
Counsel, the issue is the reference to other collateral crimes, the armed robberies, and first of all, the record should clearly reflect that everyone was on notice as to this particular issue. I mean we have talked about it really before this trial got started, about the potential pitfalls, and so the issue was there for everybody, and something else is that Investigator Ladwig *963 was called in the defense case by Mr. Morgan and asked the question: How do you know Audron Butler? And the response was that Butler provided information in several armed robbery [sic] that were going on in the area that developed Floyd and Mr. Terry as suspects here.
And I guess what I needed to do is to determine if that was a fair response to the question and whether or not Investigator Ladwig intentionally tried to get something in front of this jury that he shouldn't have.
The conclusion that I reached, knowing about this casewe've all been through the pretrial motions. We know that the information employed by Mr. Butler was based upon the armed robberies and the search warrant that eventually led to Mr. Floyd and Mr. Terry.
The long and short of the is [sic], it was, if error, defense invited error, and secondly, it was a fair response to the question asked, and based upon that, I, in the manner in which it aroseI don't know if the defense objected. If they did, the objection is overruled and I do not get to a cautionary instruction. Motion for Mistrial denied on that basis.
We find that the trial court correctly analyzed and resolved this issue under Czubak. Accordingly, the trial court did not err.
As his next claim, appellant argues that the trial court erred in allowing Demon Floyd's testimony to be used as substantive evidence. On the other hand, the state argues that this issue has not been preserved for appeal. We agree with the state. At trial, defense counsel stated:
Without waiving any objections, the Defense would stipulate to an instruction by the Court to the jury that the evidence given by Demon Floyd can be considered for substantive purposes as well as for impeachment purposes. That would give the State what it wants and it would not unfairly prejudice Kenneth Terry by having Mr. Damore up there saying something that he doesn't know the truth or falsity of.
The state still wanted to call Mr. Damore to testify, but, after acknowledging that Floyd would have to be recalled, accepted the stipulation. By stipulating to allowing Demon Floyd's testimony to be used as substantive evidence, appellant waived any claim of error. See Myrick v. Gillard Grove Service, 577 So.2d 655, 656 (Fla. 1st DCA 1991). Therefore, we find that the trial court did not commit any error.
As his ninth claim, appellant contends that the trial court erred by disallowing appellant to comment, during closing argument, on the state's failure to call Audrin Butler as a witness. This claim is controlled by our reasoning in Haliburton v. State, 561 So.2d 248 (Fla.1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991), where appellant argued that the trial court erred in refusing to allow the defense, during closing argument, to comment upon the absence of an uncalled witness's testimony. We held that the trial judge did not err in limiting the comment. Our reasoning was as follows:
The purpose of closing argument is to help the jury understand the issues by applying the evidence to the law. Thus, the purpose of closing argument is disserved when comment upon irrelevant matters is permitted. In State v. Michaels, 454 So.2d 560, 562 (Fla.1984), we said that
[w]hen such witnesses are equally available to both parties, no inference should be drawn or comments made on the failure of either party to call the witness.
We agree with the district court in Martinez v. State, 478 So.2d 871, 871 (Fla. 3d DCA 1985), review denied, 488 So.2d 830 (Fla.1986), that
an inference adverse to a party based on the party's failure to call a witness is permissible when it is shown that the witness is peculiarly within the party's power to produce and the testimony of the witness would elucidate the transaction.
Id. at 250 (citation omitted) (alteration in original).
In the instant case, during the penalty-phase closing argument, defense counsel stated:
We don't know about Audrin Butler. Even though he was the foundation of the *964 state's case right from day one, we don't know about him. The state did not call Audrin Butler as a witness.
On this record, there is no indication that Butler was not equally accessible to both parties. Moreover, the fact that the defense called Butler to testify[11] undercuts any argument that Butler was "peculiarly within the [state's] power to produce" and that his testimony would have "elucidate[d] the transaction." Thus, we conclude that the trial court did not abuse its discretion in limiting appellant's closing argument. Cf. Amos v. State, 618 So.2d 157, 162-63 (Fla.1993) (defense counsel's comments regarding state's failure to call two eyewitnesses called by defense were proper).

Sufficiency of the Evidence
A judgment of conviction comes to this Court with a presumption of correctness and a defendant's claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment. Spinkellink v. State, 313 So.2d 666, 671 (Fla.1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976). In other words, for this Court to find that the evidence is legally insufficient means that the prosecution has failed to prove the defendant's guilt beyond a reasonable doubt. Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). In contrast, sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." Id. (quoting Black's Law Dictionary 1285 (5th ed. 1979)).
We find there is sufficient evidence to support appellant's convictions for first-degree murder, armed robbery, and principal to aggravated assault. However, with respect to the first-degree murder charge, we find there is only sufficient evidence to support a felony murder theory, not a premeditated murder theory. While there is an abundance of evidence to support the conclusion that Terry shot and killed the victim during the commission of a robbery, there is simply an absence of evidence of premeditation. In fact, there is an absence of evidence of how the shooting occurred.
At trial, the state presented the following evidence against appellant: (1) Floyd's testimony describing Terry's role in the murder/robbery; (2) the guns used in the murder and assault were found in Terry's apartment; (3) a ballistic match between the bullet that killed the victim and the gun that Terry purportedly used in the murder; (4) a DNA match of the victim's blood on Terry's shoes, which Terry was wearing at the time of the murder; (5) Terry's fingerprints on a bag found at the murder scene; and (6) the testimony of Robin Morgan (a.k.a. Joe Garca), who was placed in the same jail cell as appellant in Volusia County, which revealed that Terry told Morgan that he shot the victim. Additionally, Floyd stated that he and Terry were riding around looking for a place to rob and took $160.00 from the station. The victim's husband confirmed that money was missing from the station.[12] All of this evidence supports the conviction for first-degree felony murder.
We also find Terry's conviction for principal to aggravated assault supported by substantial competent evidence. In order to be convicted as principal for a crime physically committed by another, the defendant *965 must intend that the crime be committed and must do some act to assist the other person in actually committing the crime. Staten v. State, 519 So.2d 622, 624 (Fla.1988); see also § 777.011, Fla.Stat. (1993). While Floyd committed the actual aggravated assault, Terry assisted by providing the handgun. The assault furthered the robbery and murder by keeping the two victims separated.
In sum, because there is sufficient evidence to support the convictions, we find that the trial court did not err in denying appellant's motion for judgment of acquittal.

PENALTY PHASE
Terry raises eight claims concerning his death sentence, but we will discuss only onewhether death is a disproportionate penalty in this casebecause it is dispositive.
We conclude that the death sentence must be vacated in this case because the imposition of such a sentence would not be proportionate. Given our resolution of this issue, the remaining penalty-phase issues are moot.
In the present case, the trial court found two aggravators: (1) prior violent felony or a felony involving the use or threat of violence to the person (conviction for principal to aggravated assault); and (2) capital felony committed during the course of an armed robbery/pecuniary gain. Terry waived the statutory mitigator found in section 921.141(6)(a), Florida Statutes (1993) (the defendant has no significant history of prior criminal activity). The trial court rejected Terry's age of 21 years as a statutory mitigator because there was no evidence "to suggest that [Terry's] mental or emotional age did not match his chronological age," and his age, standing alone, was insignificant. The trial court found no statutory mitigators and rejected Terry's minimal nonstatutory mitigation.
Our proportionality review requires us to "consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). In reaching this decision, we are also mindful that "[d]eath is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation." State v. Dixon, 283 So.2d 1, 7 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Consequently, its application is reserved only for those cases where the most aggravating and least mitigating circumstances exist. Id.; Kramer v. State, 619 So.2d 274, 278 (Fla.1993). We conclude that this homicide, though deplorable, does not place it in the category of the most aggravated and least mitigated for which the death penalty is appropriate.
In this case, it is clear that the murder took place during the course of a robbery. However, the circumstances surrounding the actual shooting are unclear. There is evidence in the record to support the theory that this was a "robbery gone bad." In the end, though, we simply cannot conclusively determine on the record before us what actually transpired immediately prior to the victim being shot. Likewise, although there is not a great deal of mitigation in this case, the aggravation is also not extensive given the totality of the underlying circumstances. Our proportionality review requires a discrete analysis of the facts. Porter, 564 So.2d at 1064. As stated by a federal appellate court: "The Florida sentencing scheme is not founded on `mere tabulation' of the aggravating and mitigating factors, but relies instead on the weight of the underlying facts." Francis v. Dugger, 908 F.2d 696, 705 (11th Cir.1990), cert. denied, 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991).
The first aggravator (a capital felony committed during the course of an armed robbery/pecuniary gain) is based on the armed robbery being committed by appellant when the killing occurred. The second aggravator, prior violent felony, does not represent an actual violent felony previously committed by Terry, but, rather, a contemporaneous conviction as principal to the aggravated assault simultaneously committed by the codefendant Floyd who pointed an inoperable gun at Mr. Franco. While this contemporaneous conviction qualifies as a prior violent felony and a separate aggravator, we cannot ignore *966 the fact that it occurred at the same time, was committed by a codefendant, and involved the threat of violence with an inoperable gun. This contrasts with the facts of many other cases where the defendant himself actually committed a prior violent felony such as homicide.
When we compare this case to other capital cases, we find it most similar to robbery-murder cases like Sinclair v. State, 657 So.2d 1138 (Fla.1995), and Thompson v. State, 647 So.2d 824 (Fla.1994). In Sinclair, which is factually very similar to the case sub judice, the appellant robbed and fatally shot a cab driver twice in the head. Considering these circumstances and finding there was only one valid aggravator,[13] no statutory mitigators, and minimal nonstatutory mitigation, we vacated the death sentence. In Thompson, the appellant walked into a sandwich shop, conversed with the attendant, fatally shot the attendant through the head, and robbed the establishment. On appeal, we vacated the death sentence, finding there was only one valid aggravator (the murder was committed in the course of a robbery) and some "significant," nonstatutory mitigation.[14]Id. at 827. As in Sinclair and Thompson, we find the circumstances here insufficient to support the imposition of the death penalty. We conclude that the circumstances here do not meet the test we laid down in State v. Dixon, 283 So.2d 1, 8 (Fla.1973), "to extract the penalty of death for only the most aggravated, the most indefensible of crimes."

CONCLUSION
Having reviewed the entire record and finding no reversible error, we affirm the convictions but vacate appellant's death sentence and direct that upon remand he be sentenced to life imprisonment without eligibility for parole for twenty-five years.
It is so ordered.
OVERTON, SHAW, KOGAN and ANSTEAD, JJ., concur.
GRIMES, C.J., concurs in part and dissents in part with an opinion, in which HARDING and WELLS, JJ., concur.
HARDING, J., concurs as to the conviction and dissents as to the sentence.
WELLS, J., concurs in part and dissents in part with an opinion.
GRIMES, Chief Justice, concurring in part and dissenting in part.
In setting aside the death penalty, I believe the Court is impermissibly substituting its judgment for that of the jury and the trial judge. Regardless of whether or not there was enough evidence to prove premeditation, it is clear that Terry is guilty of first-degree felony murder and that he actually killed Ms. Franco. Sinclair v. State, 657 So.2d 1138 (Fla.1995), and Thompson v. State, 647 So.2d 824 (Fla.1994), upon which the majority relies, are clearly different. In each of those cases there was only one statutory aggravating circumstance and more nonstatutory mitigating evidence than in the instant case. I know of no case in which we have heretofore set aside the death penalty on grounds of proportionality where there were two statutory aggravating circumstances and only minimal nonstatutory mitigation.
I would affirm both the convictions and the sentence of death.
HARDING and WELLS, JJ., concur.
*967 WELLS, Justice, concurring in part and dissenting in part.
I concur in the affirmance of the conviction.
I dissent to both the majority's decision that there was an absence of evidence of premeditation and that the death penalty be set aside.
The majority decided that a jury's finding of premeditation was unsupported by sufficient evidence where a man went into a service station with a loaded gun and shot a kneeling woman in the head. It is my judgment that these facts alone provide a sufficient circumstantial basis to allow a jury to find premeditation. The majority fails to demonstrate why our decision in Sireci v. State, 399 So.2d 964 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982), does not control this decision.
To support its proportionality position, the majority relies upon this Court's decisions in Sinclair v. State, 657 So.2d 1138 (Fla.1995), and Thompson v. State, 647 So.2d 824 (Fla. 1994). While I dissented in both cases, I do not believe those decisions require the majority decision in this case. The trial courts in both Sinclair and Thompson found some mitigating circumstances. Here, the trial court found no mitigating circumstances and two valid aggravating circumstances.
I believe, plainly and simply, that the Florida legislature intended that murders such as this one be covered by Florida's death penalty statute if a jury and trial judge, after properly considering and weighing aggravating and mitigating circumstances, determines that the death penalty should be imposed. Consequently, I believe the majority's decision directly violates the legislature's intent and ignores the reality of what is occurring in the communities of our state.
NOTES
[1] Terry alleges that the following testimony supported the nonstatutory mitigating circumstances: (1) Valerie Floyd testified that Terry had told her that he had been on his own since age 15 or 16, and at some point lived on the street sleeping in abandoned cars; (2) Valerie Floyd, who is the mother of Terry's child, received Aid to Families with Dependent Children; (3) Valerie stated that there were extended periods of time when Terry was unemployed and played video games at the mall; and (4) Terry loved his girlfriend and young son and treated them well and treated his girlfriend's daughter by another man as his own daughter.
[2] Appellant's claims, which are listed in the same order as they appear in his initial brief, are as follows: (1) the trial court erred in denying appellant's motion to suppress evidence seized at appellant's apartment; (2) the trial court erred by allowing the state to take a blood sample from appellant and to present evidence regarding that sample at trial; (3) the trial court erred in denying appellant access to the Florida Department of Law Enforcement analysts' notes; (4) the trial court erred in denying appellant's motion in limine regarding the medical examiner's testimony as to the victim's position before death; (5) the trial court erred in denying appellant's motion for mistrial when a defense witness testified that appellant was a suspect in other armed robberies; (6) the trial court erred in denying appellant's motion for suggestion of conflict regarding the public defender's office and appellant's codefendant; (7) the trial court erred in denying appellant's motion in limine to exclude codefendant Demon Floyd's testimony; (8) the trial court erred in allowing Demon Floyd's testimony to be used as substantive evidence; (9) the evidence is insufficient to support the convictions; (10) the trial court erred in limiting appellant's closing argument regarding the state's failure to call Audrin Butler as a witness; (11) appellant's death sentence is unconstitutional because the jury was allowed to consider both the pecuniary gain and "committed during a robbery" aggravators; (12) the trial court erred in both instructing the jury on and finding the prior violent felony aggravator; (13) the prior violent felony circumstance and jury instruction are unconstitutional; (14) the trial court erred in denying appellant's motion for mistrial when the prosecutor asked appellant's girlfriend how the victim's children referred to their mother (the victim); (15) the trial court erred in limiting appellant's penalty phase closing argument regarding the sentence which appellant could receive; (16) the trial court erred in failing to weigh the proposed mitigating circumstances; (17) section 921.141, Florida Statutes (1991), is unconstitutional; and (18) the death sentence is a disproportionate penalty in this case.
[3] Eight items were seized during the search: a gun holster, a revolver, a cap, a plastic bag, a silver-colored gun, an empty magazine, a Florida driver's license, and a Florida license plate.
[4] Even if this issue had been preserved for review, we would find that the state had probable cause to take the blood sample and find no "indication of probable tampering with the evidence" to support appellant's claim that there was a break in the chain of custody. See Peek v. State, 395 So.2d 492, 495 (Fla.1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981); see also Charles W. Ehrhardt, Florida Evidence § 901.3 (1994 ed.) ("A bare allegation of tampering by the defendant is not sufficient to break the chain.").
[5] The relevant sections of the Florida Rules of Criminal Procedure require that the prosecutor disclose to defense counsel and permit counsel to inspect, copy, test, and photograph certain information and material within the State's possession. Fla.R.Crim.P. 3.220(b)(1). Subdivision (b)(1)(B) of the same rule orders the prosecutor to disclose

the statement of any person whose name is furnished in compliance with the preceding subdivision. The term "statement" as used herein includes a written statement made by the person and signed or otherwise adopted or approved by the person and also includes any statement of any kind or manner made by the person and written or recorded or summarized in any writing or recording. The term "statement" is specifically intended to include all police and investigative reports of any kind prepared for or in connection with the case, but shall not include the notes from which those reports are compiled.
Id. Fla.R.Crim.P. 3.220(b)(1)(B) (emphasis added). Subdivision (b)(1)(J) requires the State to disclose "reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons." Id. Fla.R.Crim.P. 3.220(b)(1)(J).
At the time Geralds was decided these rules were numbered differently. See Fla.R.Crim.P. 3.220(b)(1)(ii), (b)(1)(x) (1992).
[6] At trial, Dr. Terrence Steiner, who is the associate medical examiner in Volusia County, testified in lieu of the county medical examiner because the county examiner was ill at the time of trial.
[7] Appellant claims that the Public Defender's Office has a policy under which the State Attorney's Office, in multiple defendant capital cases, determines who the Public Defender's Office will represent. He alleges that the Public Defender's Office does not make independent professional decisions on behalf of its clients; rather, it accepts the determination of the State Attorney's Office as to which defendant is most culpable. Here, appellant alleges that the State Attorney's Office determined that the Public Defender's Office should represent Floyd, and directed it to deviate from established policy in order to obtain a hastily entered plea for the express purpose of using Floyd's testimony against Terry.
[8] First, he relies on Volk v. State, 436 So.2d 1064 (Fla. 5th DCA 1983), where the court held that the public defender's staff may make determinations of conflict of interest created by public defenders in the same circuit representing adverse defendants. In other words, the decision and motion to appoint other counsel is not to be made solely by the elected public defender. Id. at 1066-67. Second, he cites to the comment to Rule Regulating the Florida Bar 4-1.7 (Conflict of Interest; General Rule) which provides, in part: "In a criminal case ... [w]here the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question." Lastly, Appellant relies on Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), where the Court addressed the standing of a death row inmate to challenge Arkansas' authority to carry out a death sentence imposed on another capital defendant. In Whitmore, the Court held that the petitioner did not have standing as the "next friend" of the other capital defendant because he had failed to satisfy the prerequisite that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability. Id. at 164, 110 S.Ct. at 1727. The Court also outlined two other requirements to assert "next friend" status: (1) "the `next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate"; and (2) the "`next friend' must have some significant relationship with the real party in interest." Id. at 163-64, 110 S.Ct. at 1727.
[9] An otherwise competent witness has the ability to testify, see section 90.601, Florida Statutes (1993), and unreliability goes to a witness's credibility, which is for the trier-of-fact to consider. Weygant v. Fort Myers Lincoln Mercury, Inc., 640 So.2d 1092, 1093 (Fla.1994). Moreover, appellant did not challenge Floyd's competency when he testified; therefore, that issue has also been waived. In short, the trial court did not err in denying appellant's motion to exclude the testimony of Demon Floyd.
[10] For example, an appellant may not complain of action taken by the trial court on his own motion, such as a motion for transfer of the case from equity to law in the trial court, or of evidence that he himself has introduced. 3 Fla. Jur.2d Appellate Review § 294 (1978).
[11] Butler was subpoenaed upon the appellant's request and when Butler did not comply, the state asked the court to issue a bench warrant. Appellant, however, did not want a warrant issued. Consequently, prior to the guilt-phase closing argument, the state motioned the court to disallow any mention by appellant of Butler's failure to appear. The court, in turn, ordered that defense counsel could not comment on Butler's failure to appear and stated "that if I were to allow what Mr. Morgan is requesting, it would produce an unfair and unlevel playing field for the state, which both sides ought to have. The motion in limine is granted, and I will not permit any testimony with regard to that."
[12] The fact that Terry had two handguns, an inoperable .25 caliber and an operable .38 caliber and gave the .25 caliber to Floyd to hold Mr. Franco in the service bay and then took the functional .38 caliber weapon to where Mrs. Franco and the money were located is not sufficient by itself to prove premeditation. See Sireci v. State, 399 So.2d 964, 967 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982).
[13] As in this case, the trial court merged as one circumstance the aggravating circumstances of murder committed for pecuniary gain and murder committed while engaged in the commission of a robbery. § 921.141(5)(d), (f), Fla.Stat. (1991).
[14] Footnote two of the Thompson opinion describes the nonstatutory mitigation as follows:

The judge found that Thompson was a good parent and provider, and that he had exhibited no violent propensities prior to the killing. Though discounting its mitigating value, the court also noted in its sentencing order that Thompson received an honorable discharge from the Navy; that he "maintained regular, gainful employment"; that he was "raised in the church"; that he "possess[es] some rudimentary artistic skills"; and that he "has been a good prisoner and has not been a discipline problem."
647 So.2d at 826.